COURT OF APPEALS
DECISION
DATED AND FILED

June 2, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP115-CR**

Cir. Ct. No. **2017CF270**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

BRYANT TAYLOR ELLIS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Brown County: MARC A. HAMMER and KENDALL M. KELLEY, Judges. *Affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Bryant Ellis challenges the denial of his postsentencing motion for plea withdrawal.[1] Ellis claims: (1) the circuit court failed to conduct an adequate plea colloquy; (2) his plea was not knowing, intelligent and voluntary; and (3) his trial attorneys were ineffective for not investigating and advising him about a potential presentencing motion for plea withdrawal based on his presentencing psychological evaluation. We reject Ellis's arguments and affirm.

## BACKGROUND

¶2 Green Bay police were dispatched following a 911 call from eighteen-year-old Ellis, who stated he had been playing with a gun and shot his best friend in the head, killing him. Ellis told police that he and his friend had consumed alcohol and marijuana after Ellis's parents had left their home. Ellis stated that his friend had first pointed the gun at him "jokingly," and Ellis then pointed the gun at his friend "jokingly," when he accidentally "hit" the trigger. After police secured the scene, Ellis was transported to the police department.

¶3 Ellis's mother subsequently arrived at the police department and told them that she and her husband had gone to work and that Ellis had called her at 3:30 a.m. saying he shot his friend. When she asked Ellis what happened, Ellis stated that he had gone downstairs to get a bottle of water and when he came back upstairs, his friend had a gun pointed at Ellis and said "freeze mother fucker." Ellis thought he was "playing" because he knew the gun was unloaded. His friend

---

[1] The Honorable Marc A. Hammer presided over Ellis's sentencing and entered the judgment of conviction. The Honorable Kendall M. Kelley presided over the postconviction motion hearing and entered the postconviction order.

2

tossed the gun on the bed, and Ellis picked it up and pointed it at his friend and said, "no, you freeze mother fucker," at which point Ellis "must've pulled the trigger." Ellis's mother stated that she usually keeps the gun in a locked safe in her bedroom "but due to Christmas money she had the unloaded gun under her bed." She also said Ellis had told her that he took the gun out "a couple days ago," but she was not sure exactly when that occurred.

¶4    Detectives then asked Ellis for further details, and he allegedly explained that a few days before the shooting, he had taken the gun out of his mother's room while she was gone, and that it was unloaded in the case. Ellis recounted that he had been playing with it in his room, and at that time it did not have a magazine or bullets in it. Ellis also told police, however, that he loaded one of the magazines when he took the gun. He also speculated that his friend may have inserted the second magazine into the gun shortly prior to the shooting.

¶5    Ellis also told police that he had the gun in his room four or five days, that his friend had come over three or four times, and that they had "played around" with it. Ellis said there were times when his friend would point the gun at the television and pull the trigger, and that his friend also pointed the gun at Ellis and pulled the trigger "a few times." Ellis also stated that the gun was loaded when it was in his room and that they would play with it while it was loaded. Ellis explained how they would load and unload the gun, and "rack" rounds out of the gun.

¶6    Ellis said that when he went downstairs to get the water, the gun was in one of his dresser drawers. He said that when he returned his friend pointed the gun at him, but Ellis did not hear it click. His friend then put the gun down, and they "did another shot of Jack Daniels." Ellis said he was sitting on the floor near

3

his friend when he grabbed the gun and started playing with it. He said he pointed the gun at his friend and said "freeze." He demonstrated how he pointed it across his body, and when he pulled the trigger the gun went off. Ellis said he was high and they "were buzzed," and when he pulled the trigger, he thought it would just go click, "like it always does." A forensic pathologist determined the victim was shot from a distance of two feet, and his death was caused by a gunshot wound that entered above the victim's right eyebrow and exited the back of his head.

¶7    Ellis was charged with first-degree reckless homicide with use of a dangerous weapon; endangering safety by use of a weapon while intoxicated; and possession of a firearm after having been adjudicated delinquent. Ellis and the State reached a tentative plea deal, but Ellis's trial counsel told the circuit court that although Ellis did not want to go to trial, he did want more time to discuss the case with his family. The court therefore removed the case from the trial calendar and set a plea hearing for approximately five weeks later. At the subsequent plea hearing, Ellis pleaded no contest to first-degree reckless homicide with use of a dangerous weapon, and the remaining charges were dismissed and read in for purposes of sentencing. The circuit court ordered a presentence investigation report (PSI).

¶8    Prior to sentencing, and as part of the preparation of the PSI, Ellis's attorneys referred him for a psychological evaluation. A psychologist for the defense testified at the sentencing hearing regarding his evaluation, concluding that Ellis "is a low functioning young adult with cognitive deficits and other limitations." He also concluded that Ellis had "poor social skills and executive functioning deficits which include poor decision making, impulsivity, and uninhibited behaviors." The psychologist further concluded that Ellis "is struggling with a mood disorder, neurodevelopmental disorder and substance

abuse." Ellis's trial counsel intended the testimony to be considered by the circuit court, not to show that Ellis was not competent, but for the court's consideration at sentencing to show that his low functioning and other mental health issues mitigated the seriousness of the offense. The trial attorneys did not ask the court to question whether Ellis's plea was knowingly, intelligently and voluntarily entered, and they did not counsel Ellis to withdraw his plea.

¶9 Represented by postconviction counsel, Ellis moved after his sentencing to withdraw his plea. He claimed: (1) the circuit court failed to conduct an adequate plea colloquy; (2) his plea was not knowing, intelligent and voluntary; and (3) his trial attorneys were ineffective for not investigating and advising him about a potential plea withdrawal based on his psychological evaluation.

¶10 Following a hearing, the circuit court denied Ellis's motion. The court concluded that the plea colloquy was sufficient to ensure the plea was knowingly, intelligently and voluntarily entered. The court also concluded that Ellis's trial attorneys had not performed deficiently because they were aware of the information in the psychological evaluation before Ellis entered his plea, and they had no reason to believe Ellis did not understand the charge and his choices. Ellis now appeals.

## DISCUSSION

¶11 After sentencing, a plea will not be disturbed unless the defendant establishes by clear and convincing evidence that a failure to withdraw the plea will result in a manifest injustice. *State v. Taylor*, 2013 WI 34, ¶48, 347 Wis. 2d 30, 829 N.W.2d 482. Whether a defendant entered a knowing, intelligent and voluntary plea is a question of constitutional fact. *State v. Brown*, 2006 WI 100,

¶19, 293 Wis. 2d 594, 716 N.W.2d 906. We review the question independently, while upholding the circuit court's factual findings unless they are clearly erroneous. *Id.* Whether counsel's performance was deficient and prejudicial are questions of law we review de novo. *State v. Mayo*, 2007 WI 78, ¶32, 301 Wis. 2d 642, 734 N.W.2d 115.

¶12    Ellis has failed to show by clear and convincing evidence that it would be manifestly unjust to disallow his plea withdrawal. At the outset, we construe Ellis's arguments to be based on alleged defects in the plea colloquy. *See State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986).[2]

¶13    The circuit court's plea colloquy was adequate. Ellis completed and signed a plea questionnaire and waiver of rights form, affirming that he had completed eleven years of schooling; that he was not currently receiving treatment for any mental illness or disorder; and that he understood the charge to which he was pleading. Ellis also affirmed that he understood the constitutional rights he was waiving by pleading no contest, among other things.

¶14    The circuit court addressed Ellis personally and asked Ellis if he had gone over the plea questionnaire with his attorneys, and Ellis affirmed that he had done so. The court also specifically asked Ellis if it could accept each statement on the completed plea questionnaire form and its attachments "just as though you made those statements here in open court today." Ellis answered, "Yes, your Honor." The court asked, "In other words, may I accept them verbatim into the

---

[2] In the circuit court, Ellis also appears to have sought to withdraw his plea based on alleged defects in the plea colloquy itself, as the court recognized in its decision and order denying Ellis's motion to withdraw his plea. Ellis also seems to continue to advance his arguments under that rubric on appeal.

record just as though you and I went through this form and the attachments line by line on the record." Ellis again answered, "Yes, your Honor." The court further asked, "And if we did that, if we went through it line by line, would you tell me that you understand each line on the—each of the pages and that you agree with them in the way that they've been filled out." Ellis answered, "Yes, sir."

¶15   The circuit court also advised Ellis during the plea colloquy that it was not bound by the terms of any plea agreement and could impose the maximum potential punishment allowed by law. The court further ascertained that no promises, agreements or threats were made in connection with Ellis's anticipated plea. The court also asked Ellis's trial counsel whether, given that Ellis was "a very young person," if counsel was "satisfied that he appreciates the gravity of his decision to go forward in this fashion today?" Counsel answered, "Yes, your Honor." The court stated that it was relying on counsel's representations, as well as on Ellis's answers to the court's questions.

¶16   Ellis nevertheless argues that the circuit court "did nothing to provide to or elicit from the defendant any substantive information related to the elements."[3] But Ellis indicated on the plea questionnaire that he understood the elements of the offense. In addition, the jury instructions containing the elements of the offense were attached to the plea questionnaire. As the court noted in its decision denying the motion for plea withdrawal, Ellis's trial attorneys went through the elements with him "line by line, [and a trial attorney] made a mark

---

[3] In this regard, Ellis relies on *State v. Hoppe*, 2009 WI 41, 317 Wis. 2d 161, 765 N.W.2d 794. We are not persuaded, however, that the circuit court relied entirely on the plea questionnaire and waiver of rights form as a substitute for a substantive in-court plea colloquy, as occurred in *Hoppe*. *See id.*, ¶31.

next to each of the elements, which indicated that the element was discussed and that the defendant had communicated that he had understood." The court asked Ellis during the plea colloquy whether, if it were to read the elements of the crime to him, would he give the same answer that he had provided on the plea questionnaire, and Ellis said he would. Moreover, the jury instructions attached to the plea questionnaire are marked with the initials "B.E." next to each element.

¶17 Furthermore, the circuit court specifically asked Ellis during the plea colloquy if his attorneys had explained to him the elements of the crime, and Ellis answered that they had. The court asked Ellis if he had enough time to discuss his case with his attorneys and if they had answered all his questions. Ellis answered, "Every single one." The court then asked, "[I]f I were to ask you to tell me in your own words why you believe you're guilty of" first-degree reckless homicide with the use of a dangerous weapon, "would you tell me the same basic facts as are contained within the Criminal Complaint that relate to that count." Ellis again answered, "Yes, your Honor."

¶18 As the circuit court itself recognized, while it could have asked Ellis if he understood each specific element, there is no reason to think he would have said "no." Neither Ellis nor his trial attorneys gave the court any reason to doubt that Ellis understood the elements of the offense. We conclude the plea colloquy was not deficient.

¶19 In addition, we are unpersuaded that Ellis's plea was not entered knowingly, intelligently or voluntarily. During the plea hearing, the circuit court noted that Ellis had been "listening carefully" and "answering confidently." The court also stated that Ellis "seem[ed] to understand what [he was] doing here today." In its decision and order denying the motion to withdraw his plea, the

court also noted that Ellis's trial attorneys had testified that they were aware of Ellis's cognitive difficulties, so they "took the time [they] needed to [talk] with [him] to make sure" that they conveyed the necessary information to him, and "he understood it."

¶20 Both of Ellis's trial attorneys testified at the postconviction hearing that they "had prior experience with low-functioning defendants," and "neither believed that there was any issue as to Ellis's competency, even after receiving the results of [the psychological] evaluation." The circuit court emphasized that "nothing that occurred during the plea colloquy itself raised any concerns that Ellis did not understand the plea agreement." Ellis's attorneys testified that they went through the plea questionnaire with Ellis on several occasions.[4] After initially agreeing to plead no contest to the single count, Ellis decided he wanted more time to discuss the case with his family. The plea hearing was therefore delayed for five weeks, and after that delay Ellis still wanted to plead no contest.

¶21 To the extent Ellis is arguing that he was not competent to understand the plea colloquy and make an informed decision due to cognitive, emotional and mental health issues, the circuit court satisfied itself that Ellis was capable of understanding the plea. Indeed, Ellis's competency was part of what the plea colloquy was designed to determine. Ellis points to nothing in the psychological evaluation demonstrating that he was incapable of entering his plea

---

[4] Ellis argues that in a case where first-degree reckless homicide is charged, several meetings would not be enough for any person to determine whether to enter a plea—much less for a person whom the parties recognize as "slow." It is not the number of meetings that matters for purposes of determining whether a plea is knowing, however; it is whether counsel is able to convey the necessary information to the defendant such that the defendant understands it and can decide what to do. Ellis's trial attorneys testified that they did exactly that.

knowingly, intelligently and voluntarily nearly three months before the psychological evaluation was completed. And, at the time of the psychological evaluation, Ellis indicated that he was then capable of understanding his plea, despite his limitations. Nor does Ellis adequately explain what questions he thinks the circuit court could have asked him to further ensure that he was pleading no contest knowingly, intelligently and voluntarily. The record demonstrates that Ellis knowingly, intelligently and voluntarily entered his plea.

¶22 We turn now to the claim of ineffective assistance of counsel. The circuit court denied Ellis's ineffective assistance of counsel claim after a hearing. The court concluded that Ellis's trial attorneys did not perform deficiently by not telling him before sentencing that he could withdraw his plea based on information in the psychological evaluation. The court noted that the results of the evaluation they had ordered before sentencing "were neither surprising nor novel to trial counsel." The court also emphasized that both attorneys testified that Ellis did not want to go to trial. The court concluded, "It therefore cannot be said that either attorney had any reason to suspect that, due to his cognitive impairment, Ellis did not understand the elements of the offense to which he was pleading or the ramifications of entering his plea."

¶23 We agree with the circuit court's conclusions. Ellis contends his trial counsel "simply needed to consider [the need to withdraw the plea] and discuss it with Mr. Ellis." According to Ellis, he thereby lost the opportunity to withdraw his plea under the "any fair and just reason" presentence plea withdrawal standard. Ellis's claim that his trial attorneys performed deficiently is dependent, however, on the premise that he would have been able to withdraw his plea presentence for a fair and just reason, and that he had a legitimate defense that could prevail at trial. *See State v. Jenkins*, 2007 WI 96, ¶28, 303 Wis. 2d 157,

736 N.W.2d 24. A fair and just reason must be something more than the desire to have a trial. *Id.*, ¶32.

¶24 Ellis appears to argue that the fair and just reason to withdraw his plea was his not understanding the elements of the offense, and he relies upon the results of the psychological evaluation to support his argument. The circuit court recognized, however, that nothing in the psychological evaluation would have led his trial attorneys to believe that he did not understand the elements. At best, the results of the psychological evaluation would have led counsel to believe that they needed to spend more time with Ellis to make sure he understood the elements, which is what they did. Moreover, Ellis does not explain what defense his attorneys should have realized he could have mounted. His statements to law enforcement show that the State could easily prove the elements of the crime, as there is little dispute Ellis shot his friend in the head with criminally reckless conduct that created an unreasonable risk of death or great bodily harm. *See* WIS JI—CRIMINAL 990 (2006).

¶25 Ellis said that he had loaded and unloaded the gun multiple times and did not know if he had unloaded it the night before he killed his friend because he had been smoking marijuana and drinking alcohol. He did not check to confirm that the gun was unloaded; he simply pointed it at his friend's head from two feet away and pulled the trigger. It is difficult to view that conduct as anything but utter disregard for human life. In addition, Ellis gave conflicting statements concerning the facts. We have no reason to doubt Ellis's attorneys' conclusions when they told Ellis that he had no legitimate defense and that he would have a hard time winning at trial. A circuit court would have no proper reason to grant a plea withdrawal motion based on Ellis later deciding that his trial attorneys were somehow wrong and that he actually had a real defense.

11

¶26 In short, Ellis has not proved that his attorneys performed deficiently or that he suffered prejudice. The court properly exercised its discretion in denying Ellis's plea withdrawal motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).